## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| JASON LEOPOLD, <br><br> *Plaintiff*, <br><br> v. <br><br> DEPARTMENT OF DEFENSE, <br><br> *Defendant*. |

Civil Action No. 14-30 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Jason Leopold is an investigative journalist who reports on national security. Dkt. 81-4 at 2 (Leopold Decl. ¶ 11). Between October 2011, Dkt. 12 at 12 (Answer ¶ 47), and December 2013, *id.* at 14 (Answer ¶ 53), he submitted approximately fifty requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to the Department of Defense ("DOD" or "the Department") for records pertaining to the government's practices at its Guantanamo Bay detention facility ("GMTO"). When the Department failed to respond to Leopold's requests, he filed this suit in January 2014. *See* Dkt. 1; Dkt. 10 at 11–12 (Am. Compl. ¶¶ 65–68).

In the ensuing nine years, the Department released records to Leopold on a rolling basis, ultimately producing 3,410 responsive records. Dkt. 78-2 at 7 (Kirby Decl. ¶ 17). Today, only two disputes remain between the parties, and those disputes are the subject of the parties' cross-motions for summary judgment pending before the Court, Dkt. 78, Dkt. 81. The first dispute centers on whether the Department conducted an adequate search in response to one of Leopold's requests: his July 10, 2023 request for "all media . . . of enteral feedings of Guantanamo Bay detainees." Dkt. 12-3 at 11. The second dispute is over whether U.S. Southern Command ("SOUTHCOM") failed to provide Leopold with an estimated date of completion for

each of his requests in violation of the FOIA, *see* 5 U.S.C. § 552(a)(7)(B)(ii), and whether the Department has a "policy or practice" of failing to comply with that provision of the Act.  Dkt. 81 at 33–45.

For the following reasons, the Court will **DENY** the Department's motion for summary judgment, Dkt. 78, and will **DENY** Leopold's cross-motion for summary judgment, Dkt. 81.

## I. BACKGROUND

### A.    Factual Background

As a reporter who covers national security, Leopold regularly submits requests for documents under the FOIA to various government agencies.  Dkt. 81-4 at 2 (Leopold Decl. ¶ 11).  Over two years, between October 2011 and December 2013, Leopold submitted approximately fifty such requests to the "Request Services Centers for the Office of the Secretary of Defense/Joint Staff . . . and [SOUTHCOM]."  Dkt. 78-2 at 3 (Kirby Decl. ¶ 6); *see also* Dkt. 10 at 3–11 (Am. Compl. ¶¶ 13–63); Dkt. 12 at 2–17 (Answer ¶¶ 13–63).  SOUTHCOM "is a component within the U.S. Department of Defense."  Dkt. 78-3 at 1 (Droz Decl. ¶ 1).  Among its many functions, SOUTHCOM's Operations Directorate "responds to requests for . . . records related to detention operations at Guantanamo Bay under the [FOIA]."  *Id.* at 1–2 (Droz Decl. ¶ 2).

The fifty-three FOIA requests originally at issue in this case sought records "concerning the individuals detained at the United States Naval Station, Guantanamo Bay, Cuba, the detention facility, and detention operations."  Dkt. 78-2 at 3 (Kirby Decl. ¶ 6).  Specifically, the requests "generally" concerned "sixteen identifiable topic areas:"

> [D]etainee hunger strikes and enteral feeding; enteral feeding restraint chairs; detainee access to contraband, legal counsel, and legal mail; detainee cell inspections, searches and raids conducted by detention facility personnel; former detainee Adnan Latif; detention facility After Action Reports related to detainee

> incidents; detention facility Standard Operating Procedures (SOPs); detention facility personnel claims of Post-Traumatic Stress Disorder (PTSD); CBS News 60 Minutes visit to the detention facility; detention facility funding; Camp Iguana; "Very Important Person" (VIP) visitors to the facility; records concerning detainee treatment and rendition; the alleged use of mind altering drugs on detainees; Periodic Review Boards; and the January 2013 shooting at the facility.

*Id.* (Kirby Decl. ¶ 6 n.1).  The request that is the focus of the parties' cross-motions for summary judgment was filed on July 10, 2013 and sought "all media, which includes but is not limited to photographs, videos, [and] artist renderings, of enteral feedings of Guantanamo Bay detainees" from January 2002 to the date of the request.  Dkt. 12-3 at 11.

After receiving each of Leopold's requests, the Department sent an "interim-response" form-letter, notifying him of the case number assigned to each request and informing him that the Department was "unable to provide an estimated completion date" at that time because "the office/components who will conduct record searches have not yet evaluated the time needed to search and review records."  *See, e.g.*, Dkt. 12-1 at 5.  Leopold avers that he "made several attempts to obtain estimated dates of completion for the FOIA requests at issue in this case, but [has] never been provided with any such dates."  Dkt. 81-4 at 1 (Leopold Decl. ¶ 2).  The Department explains that "[u]pon receiving [Leopold]'s requests for estimated completion dates, [it] was unable to provide estimated dates by which they expected to send a final response" because Leopold's requests were "exceptionally overbroad, overlapping, and voluminous," which made "such an estimation impossible or, at the very least, unhelpful to the requester." Dkt. 78-2 at 5 (Kirby Decl. ¶ 11).  The Department states that it "maintain[ed] consistent contact" with Leopold despite this.  *Id.* at 6 (Kirby Decl. ¶ 14).

**B.      Procedural Background**

Leopold filed this suit on January 9, 2014, after the Department failed to respond to his requests within the period mandated by the FOIA.  *See* Dkt. 1.  Thereafter, the parties reported on the status of the requests to the Court every eight weeks.  During that time, the Department identified 3,410 records, consisting of 33,000 pages of responsive material, that it produced to Leopold in 45 productions.  Dkt. 78-2 at 7 (Kirby Decl. ¶ 17).

In October 2022, the parties informed the Court that they had resolved most of the outstanding issues relating to Leopold's requests, but that a couple issues remained and that the parties intended to file cross-motions for summary judgment to resolve those remaining issues. *See* Dkt. 77.  Specifically, the parties disagree as to the adequacy of the search the Department conducted in response to Leopold's request for videos and artists' renderings of enteral feedings of detainees at Guantanamo Bay, and they disagree about whether the Department has a policy or practice of failing to provide estimated completion dates to requesters when asked for such dates. *Id.* at 1–3.  The Department moved for summary judgment on these issues, *see* Dkt. 78, and Leopold cross-moved for summary judgment on the same issues, *see* Dkt. 81.

## II. LEGAL STANDARD

"The Freedom of Information Act is premised on the notion that 'an informed citizenry is vital to the functioning of a democratic society . . . [and] needed to check against corruption and to hold the governors accountable to the governed.'"  *Bernegger v. Exec. Off. for U.S. Att'ys*, 334 F. Supp. 3d 74, 83 (D.D.C. 2018) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)).  Accordingly, the Act embodies a "general philosophy of full agency disclosure," *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 494 (1994) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360 (1976)), and requires that agencies disclose records on request

unless they fall within one of nine exemptions.  "These exemptions are 'explicitly made exclusive' . . . and must be 'narrowly construed.'"  *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (first quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973), then *FBI v. Abramson*, 456 U.S. 615, 630 (1982)).

"While recognizing that the number of requests for information may pose burdens on agencies, Congress determined its ultimate policy of open government should take precedence." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999).  Therefore, the Act requires agencies, when responding to requests for records, "to make more than perfunctory searches and, indeed, to follow through on obvious leads to discover requested documents."  *Id.* (citing *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998)).  "An agency fulfills its obligations under FOIA if it can demonstrate . . . that its search was 'reasonably calculated to uncover all relevant documents.'"  *Id.* at 325 (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).  It "'cannot limit its search' to only one or more places if there are additional sources 'that are likely to turn up the information requested.'"  *Id.* at 326 (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).

FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56.  *See Beltranena v. U.S. Dep't of State*, 821 F.Supp.2d 167, 175 (D.D.C. 2011).  To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In a FOIA action, the agency may meet its burden by submitting "relatively detailed and non-conclusory" affidavits or declarations that explain the search the agency conducted and the documents it withheld. *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  The Court reviews the

agency's decision *de novo*, and the agency bears the burden of sustaining its action.  5 U.S.C.

§ 552(a)(4)(B).

## III. ANALYSIS

**A.**     **Adequacy of the Search for "Artist Renderings"**

The parties first dispute the adequacy of the searches the Department conducted in

response to Leopold's request for "artist renderings of enteral feedings of GTMO detainees from

January 2002 through the present."  Dkt. 10 at 6 (Am. Compl. ¶ 29); Dkt. 12-3 at 11.  "When a

plaintiff questions the adequacy of the search an agency made in order to satisfy its FOIA

request, the factual question it raises is whether the search was reasonably calculated to discover

the requested documents."  *SafeCard Servs.*, 926 F.2d at 1201.  Accordingly, "to obtain summary

judgment[,] the agency must show that it made a good faith effort to conduct a search for the

requested records, using methods which can be reasonably expected to produce the information

requested."  *Oglesby*, 920 F.2d at 68.

An agency can ordinarily make this showing through the submission of "reasonably

detailed, nonconclusory affidavits describing its efforts."  *Baker & Hostetler LLP v. U.S. Dep't

of Com.*, 473 F.3d 312, 318 (D.C. Cir. 2006).  These affidavits must "denote which files were

searched" and "by whom those files were searched."  *Liberation Newspaper v. U.S. Dep't of

State*, 80 F. Supp. 3d 137, 144 (D.D.C. 2015) (quoting *Weisberg v. U.S. Dep't of Just.*, 627 F.2d

365, 371 (D.C. Cir. 1980)).  The affidavits must also establish that the search the agency

conducted "reflect[ed] a 'systematic approach to document location.'"  *Id.* (quoting *Weisberg*,

627 F.2d at 371).  "Affidavits that include search methods, locations of specific files searched,

descriptions of searches of all files likely to contain responsive documents, and names of agency

personnel conducting the search are considered sufficient." *Ferranti v. Bureau of Alcohol, Tobacco & Firearms*, 177 F. Supp. 2d 41, 47 (D.D.C. 2001) (citations omitted).

The inquiry is "not whether [the agency's search] actually uncovered every document extant." *SafeCard Servs.*, 926 F.2d at 1201. As a consequence, "[m]ere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for [them]." *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004) (citations omitted). Nor does "the agency's failure to turn up a particular document" necessarily mean that its search was inadequate. *Id.* The agency "must defend the search process, not its outcome." *James Madison Project v. CIA*, 593 F. Supp. 2d 78, 79 (D.D.C. 2009). "But where 'a review of the record raises substantial doubt, particularly in view of well[-]defined requests and positive indications of overlooked materials, summary judgment is inappropriate.'" *Lamb v. Millennium Challenge Corp.*, 334 F. Supp. 3d 204, 211 (D.D.C. 2018) (quoting *Valencia-Lucena*, 180 F.3d at 326).

The Department represents that it conducted an adequate search for artists' renderings in response to Leopold's FOIA request, even though the search identified no responsive records. Dkt. 78-1 at 19–20. It thus asks this Court to grant it summary judgment on this issue. *See id.* Leopold, in turn, contends that the Court cannot grant the Department's motion for summary judgment on the adequacy of this search because "there are several deficiencies in the agency's declaration." Dkt. 81 at 15. The Court agrees with Leopold that the Department has not met its burden to demonstrate the adequacy of its search.

In support of its motion for summary judgment, the Department provided a declaration from Michael Droz, the Deputy Director of SOUTHCOM's Operations Directorate. *See* Dkt. 78-3 (Droz Decl.). Within his directorate is the Detention Operations Branch, which "receives,

processes and responds to requests for []SOUTHCOM records related to detention operations at Guantanamo Bay under the Freedom of Information Act." *Id.* at 1–2 (Droz Decl. ¶ 2). Droz explains that the Department's search for "[a]rtist [r]enderings of [e]nteral [f]eedings" of GTMO detainees proceeded in three steps.

First, the Joint Task Force-Guantanamo ("JTF-GTMO") FOIA office and the SOUTHCOM FOIA office conducted physical and electronic searches in August 2020. *Id.* at 7 (Droz Dec. ¶ 19). "The physical search took place in the []SOUTHCOM legal/FOIA office and in the JTF-GTMO Combat Camera and Joint Medical Group spaces." *Id.* at 7–8 (Droz Decl. ¶ 19). "The search terms used for the electronic search were 'Artwork,' 'Rendering,' 'Artist,' 'Federal Lawsuit Art,' 'E-feeding,' 'Enteral Feeding,' and 'Internal Feeding.'" *Id.* at 8 (Droz Decl. ¶ 19). Neither search identified any responsive records. *Id.*

In addition, the SOUTHCOM Detention Operations Branch contacted the Office of Secretary of Defense ("OSD") Detainee Policy on August 24, 2020, "requesting that its personnel conduct a search for responsive records." *Id.* at 7 (Droz Dec. ¶ 18). The Detention Operations Branch took that step because "OSD Detainee Policy is the [Department of Defense] component most likely to retain any detainee artwork depicting enteral feedings," as OSD Detainee Policy "was designated as the point of contact for detainee-artwork related issues" in guidance provided by the Assistant Secretary of Defense for Special Operations/Low Intensity Conflict. *Id.* (Droz Decl. ¶ 17). "On the same day [that OSD Detainee Policy was sent the request], OSD Detainee Policy responded that they did not have any artwork depicting enteral feedings." *Id.* (Droz Decl. ¶ 18). OSD Detainee Policy also explained that "its personnel [had] contacted the [O]ffice of the Periodic Review Secretariat (PRS), the . . . component that conducts

Periodic Review Boards," and that "PRS also reported that it was not in possession of any responsive artwork." *Id.*

Finally, on May 20, 2022, the "[]SOUTHCOM legal office tasked JTF-GTMO to conduct another thorough search for any artwork depicting enteral feedings." *Id.* at 8 (Droz Decl. ¶ 20). On May 24, 2022, "the JTF-GTMO FOIA office responded, stating that both the [JTF-GTMO] Joint Detention Group and the [JTF-GTMO] Joint Medical Group did not locate any records for artwork depicting enteral feedings." *Id.*

Leopold contends that this description of the Department's search is insufficient. *See* Dkt. 81 at 15–16. As to the first search that the JTF-GTMO FOIA office and the SOUTHCOM FOIA office conducted, Leopold points out that the Department provides "no indication of what files systems were searched or how." *Id.* at 15. As to the second search that OSD Detainee Policy conducted, the declaration provides "no description of how that office searched its files" either. *Id.* Nor does the declaration provide any detail as to how the Office of the PRS conducted its search—including what files were searched and how, or even why that office was thought to have relevant records at all. *Id.* at 15–16. Finally, with respect to JTF-GTMO's follow-up search in May 2022, other than the instruction that the search be "thorough," the declaration does not describe "the nature of those groups' searches" whatsoever. *Id.* at 15.

The Court agrees that the Department's description of its search does not provide a sufficient basis for the Court to grant the Department's motion for summary judgment. "A reasonably detailed affidavit, *setting forth the search terms and the type of search performed* . . . is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment." *DeBrew v. Atwood*, 792 F.3d 118, 122 (D.C. Cir. 2015) (emphasis

added) (quoting *Oglesby*, 920 F.2d at 68).  To be sure, the Department provided the search terms

used for the initial August 2020 electronic search.  But the Department failed to provide search

terms for any of the other searches, nor did it identify the files searched for any of the searches.

And the Department did not explain the type of search—*i.e.*, physical, electronic, or both—that

OSD Detainee Policy and the Office of the PRS each conducted.

D.C. Circuit precedent "has long made clear that an affidavit containing 'no information

about the search strategies of the [agency] components charged with responding to [a] FOIA

request' and providing no 'indication of what each [component's] search specifically yielded' is

inadequate to carry the government's summary-judgment burden." *Reps. Comm. for Freedom of*

*Press v. Fed. Bureau of Investigation*, 877 F.3d 399, 403 (D.C. Cir. 2017) (quoting *Morley v.*

*CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007)).  That is largely the case here:  There is no

explanation for the type of search that OSD Detainee Policy and the Office of the PRS

conducted, and, with respect to the May 20, 2022 request, the fact that the SOUTHCOM FOIA

office "tasked" various components and offices with conducting a "thorough" search for

responsive records is not a sufficient description of the actions those components and offices

took when conducting that search.  Dkt. 78-3 at 8 (Droz Decl. ¶ 20); *see also Reps. Comm. for*

*Freedom of Press*, 877 F.3d at 403 (finding insufficient "declarations [that] . . . say that the

targeted divisions 'completed' the requested searches without ever describing how those

divisions in fact did so" (citations omitted)).

If more reason were needed to deny the Department summary judgment on this issue,

although none is, the Court also notes that the Department at no point "aver[s] that all files likely

to contain responsive materials (if such records exist) were searched." *Aguiar v. Drug Enf't*

*Admin.*, 865 F.3d 730, 738 (D.C. Cir. 2017) (quoting *DiBacco v. U.S. Army*, 795 F.3d 178, 188

(D.C. Cir. 2015)).  Although the Droz declaration does state that "OSD Detainee Policy is

the . . . component *most likely* to retain any detainee artwork depicting enteral feedings," Dkt.

78-3 at 7 (Droz Decl. ¶ 17) (emphasis added), it does not state that no other component was also

likely to have records.  *See Oglesby*, 920 F.2d at 68 (finding an affidavit that stated that "a search

was initiated of the Department record system most likely to contain the information which had

been requested" to be insufficient as it did not show that "the search method . . . was reasonably

calculated to uncover *all* relevant documents" (emphasis added)); *see also id.* (noting that "[a]t

the very least, [the agency] was required to explain in its affidavit that no other record system

was likely to produce responsive documents").

    The Court will, accordingly, deny the Department's motion for summary judgment on the

adequacy of its search for artistic renderings of enteral feedings.

**B.    Adequacy of the Search for Videos of Enteral Feedings**

    Unlike the Department's search for artists' renderings, which failed to identify any

responsive records, the Department contends that its search for videos of enteral feedings

identified so many potentially responsive records that it would be unduly burdensome for the

Department to sort through that footage to identify responsive videos, particularly since any such

videos "would almost certainly be classified and exempt from disclosure in their entirety."  Dkt.

83 at 6; *see also* Dkt. 78-1 at 14–16.  The crux of the challenge, according to the Department, is

that it has no way to determine which videos contain responsive materials without requiring that

an agency official or employee watch each and every one.  In any event, the Department argues,

requiring an employee to engage in such a massive undertaking would be for naught since any

responsive records would be exempt from disclosure.  *Id.*  Because "FOIA does not require an

agency to conduct what amounts to an unreasonably burdensome search in response to a

request," the Department contends that it is not required to devote untold hours engaging in, what it views to be, such a pointless search. *People for Am. Way Found. v. U.S. Dep't of Just.*, 451 F. Supp. 2d 6, 12 (D.D.C. 2006).

Leopold does not dispute that an agency is not required under FOIA to conduct an unreasonably burdensome search in response to a request for records. *See Goland v. Cent. Intel. Agency*, 607 F.2d 339, 353 (D.C. Cir. 1978) (concluding that the agency had met its burden of demonstrating an adequate search through "affidavits [that] g[ave] detailed descriptions of the searches undertaken, and a detailed explanation of why further searches would be unreasonably burdensome"). But he disputes the Department's contention that this is such a case. He first argues that the agency, despite its protestations to the contrary, has a way to search through the potentially responsive records without requiring an employee to watch every single video in its entirety. *See* Dkt. 81 at 4–6. Second, he contends that even if the Department is right that someone must watch every video to respond to his request, the burden on the Department would not surpass what can be reasonably demanded of an agency. *Id.* at 7–12. Third, and separate from the issue as to whether the Department is obligated to search through the records it has identified, Leopold also contends that the scope of the search the Department has conducted to date is inadequate. *Id.* at 12–14. Finally, he disputes that the Department has carried its burden of demonstrating that any responsive records would, in any event, be exempt from disclosure. *Id.* at 16–33.

1.       *The Department's search and its results*

In response to Leopold's request for "media . . . of enteral feedings," Dkt. 12-3 at 11, the Department "tasked the [JTF-GTMO] Joint Detention Group Combat Camera ('Combat Camera') and FOIA offices with conducting searches for responsive media," Dkt. 83 at 7; *see*

Dkt. 78-3 at 3 (Droz Decl. ¶ 7).  The Department argues that "the Combat Camera office was a []
logical place to search because its responsibilities include, among other things, '(1) documenting
events that occur within the detention facility, such as forced cell extractions; and (2) visually
documenting contraband within the camps, detainee related property, and exigent circumstances
including, but not limited to, medical emergencies.'"  Dkt. 83 at 7. (quoting Dkt. 78-3 at 4 (Droz
Decl. ¶ 9)).  This initial search identified approximately "14,000 mini digital video cassettes
tapes (MiniDV); 119 video home system (VHS) tapes; 130 VHS-C tapes; 1,592 compact discs
(CD's); 122 digital versatile discs; random access memory (DVD-RAM) floppy discs; 88 floppy
discs; 4 external hard drives; and 1 memory card."  Dkt. 78-1 at 14–15.  These records have "not
been indexed or archived," and the "Combat Camera team would have to convert the
media . . . to a digital format that can be stored and reviewed on a computer" in order to ascertain
their contents.  Dkt. 78-3 at 3 (Droz Decl. ¶ 7).

In his cross-motion for summary judgment, Leopold challenged the Department's
assertion that these files had not been indexed and that they constituted the entire universe of
responsive materials.  *See* Dkt. 81 at 5.  Leopold first pointed to declarations from leaders of
JTF-GTMO in prior FOIA cases that referenced some sort of indexing or labeling system for
JTF-GTMO media.  *See, e.g.*, Dkt. 81-1 at 6 (Thomas Decl. ¶ 18) ("During the first few years of
JTF-GTMO operations, Combat Camera maintained no standardized system for labeling video
and still imagery files, however, since 2007, the Combat Camera office has established a
procedure for labeling their DVDs, CDs, and electronic files."); *id.* at 17 (O'Connor Decl. ¶ 5)
("Plaintiff categorically states that JTF-GTMO did not search for images or recordings of the
detainees in Combat Camera records prior to January 2007, when the cataloguing and filing of
images, digital photographs and recordings was established.  JTF-GTMO did conduct a search of

the files from 2002 to 2007, but due to the lack of comprehensive filing system or identification of files by ISN number, was unable to identify images of the detainees in question."). Based on these declarations, Leopold cast doubt on the Department's assertion that no index of the Combat Camera media existed. He also suggested, based on those same declarations and other documents, that the Department's search to date was insufficient because it did not search any of Combat Camera's electronic files, which those declarations indicated existed. *See* Dkt. 81 at 12–14.

In response, the Department launched a further search. That effort is described in a declaration from Brigadier General Scott Hiipakka, who serves as the Commander of JTF-GTMO, and thus oversees both the "JTF-GTMO component primarily responsible for the effective operation of the FOIA program" as well as the "Joint Detention Group (JDG), which controls Combat Camera." *See* Dkt. 83-2 at 1 (Hiipakka Decl. ¶¶ 1–2). General Hiipakka explains that, "[i]n an effort to locate the index [Leopold] reference[d] . . . , JTF-GTMO personnel, including representatives from the Office of the Staff Judge, the Intelligence Directorate, the Information Technology Directorate, and the Joint Detention Group, conducted a multi-day search of both electronic and physical locations where such an inventory and/or index could be located." *Id.* at 2 (Hiipakka Decl. ¶ 4). He reports that "there were apparent efforts at different points in time throughout JTF-GTMO's history to organize physical media and electronic files, [but] none of these efforts resulted in an exhaustive inventory with the specificity or capability to easily search and identify responsive media." *Id.* And so, although "[t]his search identified various types of incomplete indices," none of those indices had "the level of clarity, specificity, comprehensiveness, reliability, or searchability" the Department thought necessary to be useful. *Id.*

14

Despite these difficulties, General Hiipakka further attests that the Department's search for the index Leopold described led JTF-GTMO personnel to uncover additional, digitized media that might be responsive to Leopold's request for videos of enteral feedings of GTMO detainees. *Id.* at 2–3 (Hiipakka Decl. ¶ 5). That media depicted both enteral feedings and "Forced Cell Extractions (FCE),"[1] which is consistent with the "historical practice" in which "enteral feedings were often preceded by, and [were] closely associated with, Forced Cell Extractions." *Id.* As a result, JTF-GTMO staff launched another search effort "for potentially responsive media, with the knowledge that videos pertaining to FCE could be responsive to [Leopold]'s FOIA request for enteral feeding videos." *Id.*

That effort consisted of an "electronic search[]" of "file extensions." *Id.* at 3 (Hiipakka Decl. ¶ 6). The search used keywords that included ".MPG," ".AVI," ".MOV," and ".MP4," which were "reasonably calculated to yield actionable results because the naming convention for video files generally does not include the type of event depicted." *Id.* (Hiipakka Decl. ¶ 6). The search "identified approximately 28,000 video files related to FCEs," of which "approximately 400 contained some indication . . . that they were related to enteral feedings." *Id.* (Hiipakka Decl. ¶¶ 7–8). A sample of 28 of those 400 videos revealed that 25 videos "contained no actual footage of enteral feedings and thus were non-responsive."[2] *Id.* at 3–4 (Hiipakka Decl. ¶ 9). The

---

[1] The Department states that an "FCE begin[s] with a team lining up in front of the camera operator and stating their names (actual or pseudonym) or guard force number, rank, position and responsibilities within a team. The videos [of FCEs] document the implementation of FCE procedures and methods the FCE team uses to: enter the cell; restrain the detainee; remove the detainee from the cell; move the detainee from location to location; secure the detainee at a location; return the detainee to the cell; and release of the detainee." Dkt. 83-1 at 4 (Suppl. Droz Decl. ¶ 9).

[2] The Department has withheld these three videos under Exemption 1, which Leopold does not challenge. *See id.* at 8 (Suppl. Droz Decl. ¶ 19). Similarly, the Department has withheld the 32

Department contends that all 28,000 videos would need to be "watched in their entirety to determine responsiveness." *Id.* at 3 (Hiipakka Decl. ¶ 7)

The majority of the 28,000 videos were found in two separate locations. The first is the "Combat Camera digital share drive," which "is a partition of the existing JTF-GTMO classified network (SECRET)" that has "no overall index or listing of . . . files by subject matter." *Id.* at 4– 5 (Hiipakka Decl. ¶ 10c). It is "organized by year; month; internment serial number (ISN); and event type, with the event type FCE representing the largest subset of videos." *Id.* The search identified approximately 17,576 potentially responsive videos. *Id.* The second location consisted of "stand-alone servers classified at the Secret and the Top Secret/Sensitive Compartmented (TS/SCI) Special Access Program (SAP) level." *Id.* at 5 (Hiipakka Decl. ¶ 10d). Those servers contain "information from a former detention facility" and "yielded approximately 7,300 videos contained within an FCE sub-folder." *Id.*

    2.   *Sufficiency of the search*

Leopold challenges the sufficiency of the search the Department conducted. He contends that the Department has "not state[d] that the Combat Camera media [files] are the only locations where responsive video and still images are likely to be located" and that "there are several other locations where responsive records are likely to be located." Dkt. 81 at 12. For support, he references declarations proffered by the Department in previous FOIA cases, which he says indicate that responsive files may exist outside of the Joint Detention Group and Combat Camera's purview. *Id.* at 9–10.

---

videos that were at issue in *Dhiab v. Trump*, 852 F.3d 1087 (D.C. Cir. 2017), and Leopold does not dispute that those records were also properly withheld under Exemption 1. Dkt. 81 at 21.

As explained above, after Leopold filed his cross-motion for summary judgment highlighting potential deficiencies with the Department's search, the Department conducted a further search to try to address certain issues he had raised.  The Court concludes that the second search adequately addressed many of Leopold's concerns with the initial search.  Specifically, Leopold's suggestion that the Department search "Combat Camera's electronic files," the "Detainee Administration section," and the "computer server" where "still images created by Combat Camera" were placed, *see* Dkt. 81 at 13–14, were addressed by the Department's latest search.  *See, e.g.*, *North v. U.S. Dep't of Just.*, 774 F. Supp. 2d 217, 223 (D.D.C. 2011) (finding that while the plaintiff there had "question[ed] the validity of [the agency]'s searches by pointing to inconsistencies in [the agency]'s prior searches, . . . [t]hose inconsistencies were the reason why [the agency] decided to conduct a new search for responsive records" and thus were no longer a reason to find the agency's search inadequate).

With respect to "Combat Camera's electronic files," General Hiipakka explains that the Department's most recent search included the "Combat Camera digital share drive," which is apparently the "Combat Camera[] electronic files" referenced by Leopold in his motion. *Compare* Dkt. 83-2 at 4 (Hiipakka Decl. ¶ 10c) *with* Dkt. 81 at 13.  General Hiipakka also explains, with respect to the files stored within the "Detainee Administration section," that "the Joint Detention Group attempted to identify any location previously associated with Combat Camera," and JTF-GTMO personnel "conducted physical searches of those locations to ensure no unaccounted-for physical media was present."  Dkt. 83-2 at 6 (Hiipakka Decl. ¶ 10h).  That search was responsive to Leopold's concern that the Department had failed to search the "video tapes" "maintain[ed]" by the Joint Detention Group and "stored in the Detainee Administration section."  Dkt. 81 at 13.  Finally, General Hiipakka explains that JTF-GTMO personnel searched

several "[p]reserved [h]ard [d]rives," "former detention facility classified servers," and two "stand-alone" computers for the Combat Camera office and a detention facility. Dkt. 83-2 at 4-5 (Hiipakka Decl. ¶¶ 10c, 10d, 10e, 10g). That search appears to have addressed Leopold's request that the "computer server" where "still images created by Combat Camera" were placed be searched. Dkt. 81 at 14. With respect to each of these supplemental searches, Leopold advances no argument to the contrary. *See* Dkt. 85.

But although the Department did endeavor to respond to Leopold's challenges to its original search, it did not do everything that Leopold urged. Specifically, it does not appear that the Department's renewed search included "offices and files related to detainee litigation and in detainees' habeas files," Dkt. 81 at 14, or "the electronic files of J-3 (Operations)," *id.* at 13. As a result, there remains the question of whether the Department's updated search "was reasonably calculated to uncover all relevant documents," *Oglesby*, 920 F.2d at 68," in light of the Department's failure to search these two areas Leopold identified.

In support of his contention that the Department's search was insufficient because it did not include "detainees' habeas files," Leopold cites to cases in which detainees have sought video records of enteral feedings, Dkt. 81 at 9–10 (citing *Dhiab v. Trump*, 852 F.3d 1087 (D.C. Cir. 2017); *Hassan v. Merrill Communications, LLC*, No. 04-cv-1194 (D.D.C. July 21, 2014)), and notes that the Department was able to find the videos associated with at least one of those cases, *id.* (citing Dkt. 78-3 at 3 (Droz Decl. ¶ 6) (noting that the Department "first located copies of the 32 video recordings that were the subject of the Court of Appeal's decision in *Dhiab*")). He then theorizes that because the "agency indicates that 'it located copies of the 32 video recordings that were the subject of the Court of Appeal's decision" in one of those cases, *Dhiab v. Trump*, "the fact that these video recordings were the only ones located by the agency suggests

that they were identified in connection with the cited habeas litigation." *Id.* at 14.  He thus concludes that the Department should have, but did not, search "offices and files related to detainee litigation and in detainees' habeas files."  *Id.*

Leopold has failed to offer anything beyond speculation to support this challenge to the sufficiency of the Department's supplemental search, nor does he point to any specific office or record system that the Department should have searched, which is likely to contain videos not otherwise identified by the Department's search.  Nor, for that matter, does the *Dhiab* case itself shine any light on how the Department was able to identify the relevant videos in that case, as both the court order requiring the Department to release the videos and the D.C. Circuit opinion discussing their placement under seal are silent on the topic.  *See Dhiab v. Trump*, 852 F.3d 1087, 1089 (D.C. Cir. 2017) ("[T]he district court ordered the government to provide Dhiab's attorney, who had been given a security clearance, copies of the video recordings, the existence of which the government had disclosed."); *Dhiab v. Obama*, 74 F. Supp. 3d 16, 19 (D.D.C. 2014); *Dhiab v. Obama*, No. 05-cv-01457, (D.D.C. June 16, 2014), Dkt. No. 225.  This challenge to the adequacy of the Department's supplement search, accordingly, turns on "mere speculation," which is insufficient to undermine an agency's showing on an adequate search. *SafeCard Servs.*, 926 F.2d at 1201; *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) (finding that the plaintiff there "fail[ed] to offer evidence of circumstances sufficient to overcome an adequate agency affidavit" because he "[did] not maintain that the Department failed to search particular offices or files where the document might well have been found"); *Leopold v. Nat'l Sec. Agency*, 118 F. Supp. 3d 302, 311 (D.D.C. 2015) ("It is not even clear whether all the sources Leopold identifies exist, and in any event, the . . . search appears to have been reasonably calculated to uncover all responsive records.").

19

Leopold's other challenge to the Department's supplemental search—that the Department should have but did not search the J-3 file system—fares better.  To raise this theory above the speculative level, Leopold once again relies on declarations submitted by the Department in other FOIA litigation.  One such declaration, dated April 15, 2010, from the then-Chief of Staff for JTF-GTMO, explains that, at a prior time, "Combat Camera was under the purview of the J-3, and since that time Combat Camera was transferred to the control of the Joint Detention Group, and consequently has now been set up as a separate office under JTF-GTMO."  Dkt. 81-1 at 22 (O'Connor Decl. ¶ 19).  The declaration also explains that certain images at issue in that FOIA case, relating to media of specific detainees, "were found in the J-3 file system, possibly as a remnant of the time when the Combat Camera was under the purview of J-3."  *Id.*  Leopold contends that this declaration "raises substantial doubt" as to the sufficiency of the search, *Valencia-Lucena*, 180 F.3d at 326, particularly in light of the fact that the footage discussed in that declaration appears to overlap with the media Leopold seeks, *see e.g.*, Dkt. 81-1 at 18 (O'Connor Decl. ¶¶ 7-8) (discussing FCE videos from Combat Camera that may be responsive to the FOIA request at issue in that case).  The Court agrees.

Although "[t]here is no requirement that an agency search every record system" to respond to a FOIA request, an "agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested."  *Oglesby*, 920 F.2d at 68.  Here, Leopold has provided sufficient reason, beyond "[m]ere speculation," to question whether the search should have included J-3 files, *Wilbur*, 355 F.3d at 678, and the Department has not provided an answer on that score.  Even in its redoubled efforts to respond to Leopold's search, the Department does not state that it searched the J-3 files for potentially responsive materials, nor does it explain why it failed to do so.  *See* Dkt. 83 at 9–10.  It instead merely emphasizes the

efforts it expended when conducting the latest search. *Id.* at 10 (noting that the 27 Department employees and contractors "spent 212 manhours identifying the universe of potentially responsive media"). But assurances of the thoroughness of its search of other areas under JTF-GTMO's control does not explain why that effort did not include J-3 files. And although General Hiipakka attests that "the Joint Detention Group attempted to identify any location previously associated with Combat Camera," he also explains that this follow-up search was limited to "physical searches of those locations to ensure no unaccounted-for physical media was present." Dkt. 83-2 at 6 (Hiipakka Decl. ¶ 10h). But Leopold's argument is that the search to date should have, but has not, included a "search [of] the electronic files of J-3 (Operations);" the Department search for J-3's physical media is nonresponsive to that concern. Dkt. 81 at 13.

In the absence of any explanation for why the Department failed to search the electronic files of J-3, the Court concludes that it has failed to satisfy its burden as to the adequacy of its search for responsive videos of enteral feedings of GTMO detainees and concludes that it should have searched the electronic J-3 files (or provided a reason why doing so is unnecessary). *Cf. Valencia-Lucena*, 180 F.3d at 327 ("[The agency's] failure to search the center it had identified as a likely place where the requested documents might be located clearly raises a genuine issue of material fact as to the adequacy of the [agency']s search.").

3.   *Burden to review potentially responsive media*

Separate from the question of whether the Department has identified the universe of all potentially responsive videos, the Court must consider what obligations the Department has to review each potentially responsive video to determine whether it, in fact, contains responsive images. That is, having located the correct universe of virtual "file cabinets" that might contain response material, is it now required to review each file contained in each of the thousands of

"file cabinets" it has identified?  The Department contends that "a review of the potentially responsive media would be unduly burdensome" because Department personnel would have to watch every single video to determine if it contains responsive images.  Dkt. 83 at 10.  And because "an agency need not honor a FOIA request that requires it to conduct an unduly burdensome search," *Pub. Citizen, Inc. v. Dep't of Educ.*, 292 F. Supp. 2d 1, 6 (D.D.C. 2003), the Department contends that it is not obligated under FOIA to go through those records to respond to Leopold's request, Dkt. 83 at 10.

As a threshold consideration, Leopold disputes that a DOD employee would need to watch each video to determine whether it is responsive.  He contends, as discussed above, that the Combat Camera files have been indexed in the past and that indexing, even if incomplete, could be used to filter the responsive videos from the nonresponsive videos without requiring anyone to view each video.  Dkt. 81 at 5–6.  The Department responded to that assertion, at least in part, by conducting the search described above.  *See also* Dkt. 83-2 (Hiipakka Decl.) (describing the search effort for an index of Combat Camera media).  That "search identified various types of incomplete indices, but nothing with the level of clarity, specificity, and comprehensiveness, reliability, or searchability that Plaintiff asserts."  *Id.* at 2 (Hiipakka Decl. ¶ 4).  Thus, according to General Hiipakka, none of the historic efforts made by JTF-GTMO "to organize physical media and electronic files" has "resulted in an *exhaustive* inventory with the specificity or capability to *easily* search and identify responsive media."  *Id.* (emphasis added).

Although Leopold has not provided any response to these assertions, Dkt 85, the Court is not yet persuaded that the Department lacks even partial inventories that might assist it in narrowing the universe of electronic files that it would need to view in order to respond, in a reasonable manner, to Plaintiff's FOIA request.  To be sure, the Hiipakka declaration must be

"accorded a presumption of good faith," *SafeCard Services*, 926 F.2d at 1200, but that presumption extends only as far as the declaration goes, and, here, General Hiipakka does not dispute that some "incomplete indices" do in fact exist.  To the extent those indices might help identify electronic files that are likely to include responsive material, they would lessen the burden that the Department invokes in declining to review the files.  And those indicies might provide an avenue for the Department to provide at least a less-than-perfect response to Leopold's FOIA request.  In any event, without additional information, the Court cannot conclude that the absence of an "exhaustive inventory"—as opposed to a "partial inventory"— supports granting summary judgment in the Department's favor.

In further considering the burdensomeness of the search the Department contends it must undergo to determine which videos are responsive, it is useful to divide the universe of potentially responsive videos into two categories: the "physical media," identified in the first search the Department conducted, and the "digitized media[,] identified during the updated JTFGTMO search."  Dkt. 83 at 10–11.

**a.**

The Court begins with the latter category, mindful that "[i]f the reasonableness of a search is questioned, the burden is on the agency to 'provide sufficient explanation why a search . . . would be unreasonably burdensome.'"  *People for Am. Way Found.*, 451 F. Supp. 2d at 12 (quoting *Pub. Citizen, Inc. v. Dep't of Educ.*, 292 F. Supp. 2d 1, 6 (D.D.C. 2003)).  "This required showing is not insignificant;" to the contrary, "[c]ourts have consistently found that 'merely claiming that a search would be costly and take many hours to complete is insufficient.'" *Prop. of the People, Inc. v. U.S. Dep't of Just.*, 530 F. Supp. 3d 57, 63 (D.D.C. 2021) (quoting *Anderson v. U.S. Dep't of State*, 661 F. Supp. 2d 6, 12 n.3 (D.D.C. 2009)).  But "[u]nless there is

'some reason to believe that the . . . documents could be located without an unreasonably burdensome search,' the Court should generally accept the reasons provided in the defendant's affidavits." *People for Am. Way Found.*, 451 F. Supp. 2d at 14 (quoting *Goland*, 607 F.2d at 353).

The dividing line between a merely burdensome search and an unreasonably burdensome search, however, is not easy to draw, and only limited guidance is available on this question from the D.C. Circuit. To start, the Court notes that FOIA does, at times, require agencies to engage in extremely demanding searches and reviews for responsive records. Indeed, in this case itself, the Department took seven years to search for and to release "over 33,000 pages" of responsive records. Dkt. 78-1 at 11 ("[o]ver the course of the next seven years, Defendants released responsive, non-exempt materials to Plaintiff every eight weeks"). But there are limits, even if they are not clearly defined. One benchmark can be found in the D.C. Circuit's decision in *Goland v. Central Intelligence Agency*, 607 F.2d 339, 353 (D.C. Cir. 1978), where the court held that a FOIA request for records used to prepare for congressional testimony did not require the agency to conduct "'a page-by-page search' through the '84,000 cubic feet of documents in the (CIA) Records Center,'" where "[e]ven if such a page-by-page search were undertaken, it would be 'impossible to determine which documents, if any, were in fact used to prepare for congressional testimony on the legislation cited by plaintiffs.'" *Id.* at 353. In other cases, the D.C. Circuit has reached similar conclusions, holding, for example, that "a request to inspect 'every chronological office file and correspondent file, internal and external, for every branch office, staff office [etc.]' of the Census Bureau in hopes of discovering information regarding the Bureau's promotion practices was . . . unreasonable, as was a request to inspect 'every division or staff administrative office file in the Bureau which records, catalogues, or stores [promotion

forms or memos].'"  *Nation Mag., Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 891–

92 (D.C. Cir. 1995) (quoting *Am. Fed'n of Gov't Emps., Local 2782 v. U.S. Dep't of Com.*, 907

F.2d 203, 208–09 (D.C. Cir. 1990)).  And, in a case very similar to this one, Judge Bates agreed

with the Department that requiring it to "search pre-2007 Combat Camera videos taken at

Guantanamo"—a search that the Department represented would take a team of 12 persons "over

a year" to complete—was unduly burdensome.  *Int'l Counsel Bureau v. Dep't of Def.*, 723 F.

Supp. 2d 54, 59–60 (D.D.C. 2010).

> Here, in its second search effort, the Department "identified 28,000 electronically stored

FCE-related videos."  Dkt. 83 at 11.  It contends that each of those videos "would need to be

individually opened and reviewed in their entirety for responsiveness."  *Id.* (citing Dkt. 83-2 at 3

(Hiipakka Decl. ¶ 7)).  That is because "JTF-GTMO does not currently possess the technical

means to conduct sophisticated electronic searches for responsive media;" it can only "search[]

for words contained in the title of their file names."  *Id.* (citing Dkt. 83-2 at 3 (Hiipakka Decl.

¶ 6)).  Reviewing all 28,000 videos, the Department explains, "would require an enormous

expenditure of time and resources," necessitating "countless manhours and personnel."  *Id.* at 12.

And, in the Department's view, the effort expended to watch all those videos would likely be for

naught.  "Through extensive fact-finding," the Department explains, "JTF-GTMO made its best

efforts to identify and review some of the digitized media more likely to be responsive," which

produced "400 electronically stored videos with some indication that they related specifically to

enteral feedings, as opposed to being only FCE-related."  *Id.* at 12 (citing Dkt. 83-2 at 3–4

(Hiipakka Decl. ¶ 8, 9)).  Of those, a sample of 28 videos were reviewed and only three videos

were responsive.[3]  *Id.* (citing Dkt. 83-2 at 3–4 (Hiipakka Decl. ¶ 9)).  Moreover, as discussed further below, the Department maintains that any "responsive media would be classified or otherwise exempt from disclosure."  *Id.*  The Department thus contends that it would be unreasonably burdensome for it to watch all 28,000 (or now, 27,972) videos, the vast majority of which would likely be nonresponsive, only to identify a relatively small number of responsive videos that the agency would nonetheless withhold under an applicable FOIA exemption.

In making its case for why it would be an unreasonable burden to view all 28,000 videos, however, the Department notes that it did have a way to isolate from the 28,000 videos those videos that it believed were more likely to contain responsive images.  The Hiipakka declaration explains that the Department selected the 400 videos it deemed "more likely to be responsive" based on "file names, partial index comments, [and] folder names" that indicated those files "were related to enteral feeding."  *Id.*; Dkt. 83-2 at 3 (Hiipakka Decl. ¶ 8).  That assertion is at odds with the Department's contention that the only way to whittle down the entire universe of potentially responsive electronic media it has identified is to view every single piece of media.  The Department, moreover, does not indicate how many hours it would take to review the remainder of the 400 more-likely-responsive videos.  In addition, although the Department identified only 3 responsive videos out of a sample of 28, that result shows that this tranche of videos does contain responsive images.  It bears note, however, that—consistent with the Department's contention that any further search efforts would ultimately be for naught—the Department withheld the 3 responsive videos under Exemption 1, and Leopold has not challenged that withholding.

---

[3] As noted above, Leopold does not challenge the Department's decision to withhold these three videos.

Finally, the Department provides no response to Leopold's contention that the agency could use the "names and/or ISNs of detainees subjected to enteral feeding or the dates of the enteral feedings" to narrow the universe down further. Dkt. 81 at 6. Although "the agency need not deploy every conceivable search term or permit the FOIA requester to dictate the search terms in the course of litigation, . . . [the agency] must use terms reasonably calculated to locate responsive records." *SAI v. Transp Sec. Admin.*, 315 F. Supp. 3d 218, 241 (D.D.C. 2018). And when the plaintiff "produce[s] countervailing evidence" that reveals "problems with . . . the specific search terms used," that may be "sufficient to establish a genuine dispute of material fact as to the adequacy of the search." *Flete-Garcia v. U.S. Marshals Serv.*, 613 F. Supp. 3d 425, 432–33 (D.D.C. 2020) (quotations omitted). Here, Leopold has identified search parameters that the Department itself uses to distinguish its ability to respond to a prior request from Leopold's request here. *See* Dkt. 83 at 8 n.3 (explaining that the Department could locate the videos of enteral feeding at issue in *Dhiab* because that "litigation involved only thirty-two videos from a ten-month timeframe for a single detainee"). But the Department does not explain why, if provided with the "names and/or ISNs of detainees" and specific dates, those search terms would not be applicable here.

The Court does not doubt that, even with these efforts to narrow the scope of the required review, the undertaking could require a daunting effort. Even a rough estimate of the number of hours required, however, is not evident on the current record.

**b.**

Turning then to the physical media that the Department identified in its first search, the Department contends that viewing even this smaller universe of media would be so unreasonably burdensome that the Department should not be required to undertake that task. Dkt. 78-1 at 14–

16.  As previously described, this initial search identified approximately "14,000 mini digital video cassettes tapes (MiniDV); 119 video home system (VHS) tapes; 130 VHS-C tapes; 1,592 compact discs (CD's); 122 digital versatile discs; random access memory (DVD-RAM) floppy discs; 88 floppy discs; 4 external hard drives; and 1 memory card."  Dkt. 78-3 at 3 (Droz Decl. ¶ 7).  These records have "not been indexed or archived" and the "Combat Camera team would have to convert [the majority of] the media . . . to a digital format that can be stored and reviewed on a computer" in order to ascertain their contents.[4]  *Id.* (Droz Decl. ¶ 7).  The average length of each of the MiniDV and VHS tapes is "approximately 35 minutes."  *Id.* (Droz Decl. ¶ 8).  "Due to Combat Camera's limited manpower and extensive responsibilities," the Department estimates that it would take "approximately three to five years to completely review, index, and archive all of the media" at a rate of "one hour per week."  *Id.* at 4 (Droz Decl. ¶¶ 9–10).  This, the Department contends, is "unduly burdensome and is not required by the FOIA."  Dkt. 78-1 at 16.

Leopold argues that, even assuming that it would take Combat Camera the full five years to review the physical media, that equates to only 260 hours of work.  Dkt. 81 at 10–11.  That level of work, in turn, could require only about 50 hours more than the Department expended in its second search effort to identify the universe of potentially responsive records.  *See* Dkt. 83-2 at 6 (Hiipakka Decl. ¶ 11) (stating that "these efforts to determine the full 'universe' of possible responsive material took approximately 212 manhours").  And, on his telling, it is certainly not excessive in light of what decisions from this Court have required of agencies in responding to a FOIA request.  *Compare Kwoka v. Internal Revenue Serv.*, No. 17-CV-1157 (DLF), 2018 WL

---

[4] Leopold contends that "some of the Combat Camera media at issue in this case is already in digital format."  Dkt. 81 at 8.  The Department does not dispute that 122 of the physical media found has already been converted to digital format.  Dkt. 83 at 10–11 n.4.

4681000, at *5 (D.D.C. Sept. 28, 2018) ("[T]he Court will not allow it to withhold the documents wholesale simply because it will (potentially) take 2,200 hours to review them for redactions."), *with Wolf v. C.I.A.*, 569 F. Supp. 2d 1, 9 (D.D.C. 2008) (finding the agency was entitled not to review microfilm to respond to a FOIA request when doing so would require the agency to "review the reels on a frame-by-frame basis, which would take approximately 3675 hours and cost about $147,000"); *Int'l Couns. Bureau v. U.S. Dep't of Def.*, 723 F. Supp. 2d 54, 59 (D.D.C. 2010) ("[T]he Court agrees with the Department that enlisting a full-time staff of twelve for a year to review hundreds of thousands of unsorted images would impose such an undue burden").

The problem with this response is that it is difficult to reconcile Leopold's conclusions with much of what Droz says.  Leopold is correct that Droz asserts that it would take 3 to 5 years to "completely review, index, and archive all of the media" discussed in his first declaration and that JFT-GTMO-JDG Combat Camera "could only dedicate one hour per week toward this task." Dkt. 78-3 at 4 (Droz Decl. ¶¶ 9-10).  But Droz also says that the Department had identified "14,000 mini digital video cassettes tapes (MiniDV); 119 video home system (VHS) tapes; 130 VHS-C tapes; 1,592 compact discs (CD's); 122 digital versatile discs; random access memory (DVD-RAM) floppy discs; 88 floppy discs; 4 external hard drives; and 1 memory card." *Id.* at 3 (Droz Decl. ¶ 7).  And he says that it would take 2 to 4 hours to review, index, and archive each of the 14,000 MiniDVs and 119 VHS tapes, and, indeed, that it would take 3 to 5 "years [just] to convert the . . . MiniDVs to an updated format which could be reviewed." *Id.* at 3–4 (Droz Decl. ¶ 8).  Based on Droz's description, it would then take over 7,000 hours to review the entirety of just the MiniDVs.  *See id.*

The Court, accordingly, is once again left with insufficient information reasonably to gauge the length of time—and the effort—that would be required to review the relevant media to identify responsive material.  At a minimum, the Droz declaration is unclear, and it does not account for any shortcuts that might help expedite the review.  To be sure, it might not take 3 to 5 years to complete the review.  But the Court cannot imagine how the review could possibly be completed in a mere 260 hours.

*   *   *

With all this in mind, the Court is unpersuaded that the only way for the Department to respond to Leopold's request is to watch every one of the 28,000 electronically stored videos, and every one of the MiniDVs, VHS tapes, compact discs, and floppy discs it has identified as containing potentially responsive material.  But, at the same time, the Court has little doubt that an effort to identify the potentially responsive material with even a fair degree of accuracy would involve an enormous—albeit not yet quantified—effort.  One final piece, however, is necessary for the Court to decide whether further efforts are required.  As explained above, the Court cannot assess whether a burden is *unreasonable* without evaluating whether the effort is likely to yield any meaningful results.  *See*, *e.g.*, *Goland*, 607 F.2d at 353.  To consider that question, the Court turns to the parties' arguments regarding the relevant FOIA exemptions.

4.    *Exemptions 1, 3, 6, and 7E*

The Department contends that even if it were able to identify the responsive videos, they would be exempt from disclosure under FOIA Exemptions 1, 3, 6 and 7(E).  If that is correct and any records responsive to Leopold's request could and would be withheld, the Department's argument continues, it should not be required to undertake a burdensome search—one that could take years to complete—only to withhold those records for reasons that are evident today.

30

Leopold, in response, agrees that some of the material at issue is likely exempt, but he argues that redactions and segregation may address those exemptions and maintains that, in any event, the Department has failed to carry its burden of demonstrating the exemptions apply.

Much of Leopold's argument challenges the procedural propriety of the Department's invocation of the asserted FOIA exemptions at this stage of the litigation.  He argues, for example, that the Department should have prepared a proper *Vaughn* index and that it failed to comply with the relevant procedural requirement for withholding allegedly classified documents pursuant to Executive Order 13,526 and FOIA Exemption 1.  Dkt. 81 at 14, 25.  In this vein, he argues that "there is no evidence [1] that an individual with original or derivative classification authority classified the enteral feeding videos or images," [2] that the records are properly marked pursuant to Executive Order 13,526, or [3] that the Department has classified the records at issue before receiving the FOIA request.  *Id.* at 22, 25–29.  He further argues that at least the original Droz declaration was too conclusory to support invocation of Exemption 1, *id.* at 17, although he offers no response to Droz's supplemental, far more detailed declaration, Dkt. 83-1 at 1–8 (Supp. Droz Decl.); *see also* Dkt. 85 (declining to file a reply brief).  Leopold also stresses that, in invoking Exemption 7(E), the Department merely asserts that the videos "would likely depict the tactics, techniques, and procedures used by the guard force when conducting detention operations," Dkt. 78-3 at 6 (Droz Decl. ¶ 16), and he argues that these representations are insufficient to meet the Department's burden, *see* Dkt. 81 at 31.

These procedural criticisms, however, misunderstand the nature of the Department's argument.  The Department is not seeking to justify its decision to withhold the records at issue, which would, as Leopold correctly observes, put the Department to its burden of providing a detailed explanation for its reasons for withholding each record.  Rather, the present dispute

arises in a different posture:  The Department is arguing that it would be unreasonably burdensome to require it to engage in a years-long review of potentially responsive media because it foresees that the records that any such effort might identify could "be classified and exempt from disclosure," Dkt. 78-1 at 16-17, and "would be exempt from disclosure pursuant to FOIA Exemption 3," *id.* at 17, and "FOIA Exemption[] 7(E)," *id.* at 18.  Those are necessarily predictive assertions, which the Department must support in appropriate manner.  But they are not representations that specific records have been withheld for specific reasons, which can be set forth in a detailed *Vaughn* index or which can be connected to a specific classifying officer who properly marked each record.

In *Goland*, the D.C. Circuit did not require the agency to explain in a *Vaughn* index or detailed declaration why "it would be 'impossible to determine'"—on a document-by-document basis—whether a particular document was "in fact used to prepare for congressional testimony" when there were "84,000 cubic feet" of potentially relevant documents.  607 F.2d at 353.  At least in principle, the same holds true here.  If the Department can meet its burden of showing that a years-long effort to identify the responsive media *would be* pointless because the records at issue *would be* properly withheld, the Department need not make the type of particularized, record-by-record showing that is usually required in FOIA litigation.  To hold otherwise would require the agency to engage in a pointless search to gather detailed information that would, on this theory, be required to show that the agency need not engage in that very search.  *Cf. Amnesty Int'l USA v. C.I.A.*, 2008 WL 2519908, at *11 (S.D.N.Y. June 19, 2008) (determining that declaration establishing that certain offices did not possess relevant documents was enough to overcome agency's burden because "FOIA does not demand a search that would be futile" (citing *Am.-Arab Anti-Discrimination Comm. v. U.S. Dep't of Homeland Sec.*, 516 F. Supp 2d

83, 88 (D.D.C. 2007) (holding that where ICE official stated that the relevant office had no responsive documents, such statements were sufficient "if not exactly to show the adequacy of the search, then to explain why a search would be futile and unnecessary").

But that does not mean that the Court and Plaintiff must simply take the agency at its word that the search would be futile.  Here, the Department relies primarily on the Supplemental Droz Declaration, which contains a far more detailed explanation than his original declaration for why any responsive media that might be found would be withheld on the ground that it is classified and thus exempt from disclosure.  He offers three reasons why videos depicting enteral feedings "would be" properly classified:

First, Droz explains that "[c]ertain force protection information is classified because release would cause serious damage to national security by reducing the effectiveness of force protection measures at JTF-GTMO and other detention facilities and expose U.S. personnel, as well as detainees, to the risk of harm."  Dkt. 83-1 at 3 (Suppl. Droz Decl. ¶ 8).  He then explains that "[h]istorically, enteral feedings are preceded by, and therefore closely associated with, forced cell extractions (FCE)" and revealing videos of FCEs "poses a risk to military personnel as detainees and others armed with such information can develop countermeasures to FCE tactics, techniques, and procedures."  *Id.* at 4 (Suppl. Droz Decl. ¶ 9).  He also explains that, in addition to the FCE that precedes the enteral feeding, the video depicting the feeding itself presents "[m]any of the same concerns" because "[t]hroughout the enteral feeding, there is a continued demonstration of security techniques, tactics, and procedures used by DOD personnel at JTF-GTMO."  *Id.* (Suppl. Droz Decl. ¶ 10).  For example, "[o]n display" during an enteral feeding "[is] the manner in which the detainee is secured and unsecured, the layout of the enteral

feeding space, location of equipment that could be used as a weapon, and the number of personnel involved." *Id.* (Suppl. Droz Decl. ¶ 10).

Second, Droz explains that videos of enteral feedings would be properly classified because it may contain "close-up images of detainees and former detainees that clearly identify the faces of the individuals" which "is properly classified SECRET." *Id.* at 5–6 (Suppl. Droz Decl. ¶ 13. Because "every detainee is a potential source of intelligence" and detainees should be "protect[ed] . . . from public curiosity, consistent with international law, as part of [the Department's] policy on humane treatment," videos that contained such images would be properly classified. *Id.* at 6 (Suppl. Droz Decl. ¶¶ 13–14).

Finally, Droz explains that "[r]elease of videos that clearly identif[y] detainees being restrained while being enterally fed, as well as receiving medical care while restrained, would exacerbate the world's perception of detainees in U.S. custody." *Id.* (Suppl. Droz Decl. ¶ 15). The videos would, for example, depict military personnel "physically handling the detainee, bodily moving him from one place to another, restraining him, and facilitating a medical procedure not commonly viewed by the general public." *Id.* at 6–7 (Suppl. Droz Decl. ¶ 15). "Due to the circumstances surrounding the forcible cell extraction and enteral feeding," moreover, "persons and groups hostile to the United States [would be able to] manipulate and use the FCE videos in order to further their efforts to undermine the national security of the United States." *Id.* at 7 (Suppl. Droz Decl. ¶ 15). The Department is particularly concerned that extremist groups could manipulate the sound or visual imagery, as they have done in the past, to generate "propaganda to increase recruitment, as a fund-raising tool, to incite violence against American Troops abroad, [and] to encourage Western converts into action in an attempt to show

solidarity with extremist groups" in a manner that "undermine[s] the national security of the United States." *Id.* at 7 (Suppl. Droz Decl. ¶ 16).

The Department's contention that all the media that Leopold seeks would be classified finds some support, moreover, in experience to date and in the nature of the request itself. As explained above, the Department located 3 responsive videos in its review of the 28 sample videos, and, without objection from Leopold, it has withheld those videos on the ground that they are classified. Similarly, the Department was able to locate the 32 videos that were at issue in the *Dhiab* case, and, consistent with the D.C. Circuit's analysis in *Dhiab*, 852 F.3d at 1096–98, it has withheld those 32 videos on the ground that they are classified. Again, Leopold does not dispute that withholding. Thus, of the 35 videos located to date, all have been withheld pursuant to Exemption 1—without objection. It bears note, moreover, that Leopold's request is targeted at precisely the material that the Department asserts would be classified: he seeks "all media" that records "enteral feedings of Guantanamo Bay detainees," Dkt. 12-3 at 11. This is not a case, in other words, in which a subset of the material the requester seeks is arguably classified; rather, he seeks the very material that, according to the Department, "reasonably could be expected to result in damage to the national security, . . . and the original classification authority is able to identify or describe the damage." *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 81 (D.D.C. 2018), *on reconsideration in part*, 442 F. Supp. 3d 240 (D.D.C. 2020) (quoting EO 13,526 § 1.1(a)).

Leopold, however, made several arguments in his opening brief that—unlike many of his procedural arguments—bear on the Department's explanation for why further review would serve no meaningful purpose, and those arguments merit consideration. Before turning to these arguments, the Court notes that Leopold failed to file a reply brief—or to offer any evidence—in

response to the Department's opposition, which included the Supplemental Droz Declaration and, instead, merely relies on the arguments raised in his opening brief.  But the arguments that he raised in that early submission do take issue with Droz's contention that not even portions of the videos can be disclosed consistent with national security.

Leopold asserts, for example, that he is not seeking the portions of the videos that depict forced cell extractions, only "the performance of enteral feeding," Dkt. 81 at 18, and he notes that the Department has yet to assert "that any of the enteral feeding videos—much less all of them—show resistance or disruptive conduct by the detainee[s]," *id.* at 20.  He further "notes that there is a publicly available video in which Guantanamo personnel pick up and show the objects used for enteral feeding while also describing how the process is carried out" and maintains that the Department has yet to show "that the recordings or still images at issue contain significantly more information than previously released imagery."  *Id.* at 23.  And, in discussing FOIA Exemption 3 and 10 U.S.C. § 130b, he argues that the names, images, and other identifying information associated with Guantanamo personnel could be segregated out by "blurring videos or redacting still images."  *Id.* at 30.  The Department, in turn, maintains that "requiring JTF-GTMO and SOUTHCOM to obtain . . . . capabilities [to blur images in this manner] would be unduly burdensome."  Dkt. 83 at 18; *see also* Dkt. 83-1 at 7 (Suppl. Droz Decl. ¶ 17) ("Neither []SOUTHCOM nor JTF-GTMO maintain the capability to edit or redact exempted portions from the media.  While other components within [the Department] may have these technical capabilities, it would be unduly burdensome to require [the Department] to go to

such lengths when the videos would be exempt in their entirety as currently and properly classified."); *but see Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 587 (D.C. Cir. 2020).[5]

On the present record, the Court can only conclude that it seems likely that most, if not all, of the videos at issue could be withheld under FOIA Exemption 1.  A more complete showing would be required, however, to permit the Court to conclude with confidence, as the Department urges, that the entirety of each and every one of the videos would, in fact, be classified or otherwise exempt from disclosure.

5.      *Conclusions regarding the adequacy of the search*

As the above analysis reflects, the Court is persuaded that the process of locating the media that shows "enteral feedings of Guantanamo Bay detainees" would require an enormous effort.  But beyond that general understanding, the Court cannot determine on the basis of the present record whether the effort is one that can be accomplished in a year or five years.  The Court cannot discern, for example, whether partial indices could shorten the process and whether other DOD components might be available to assist with the digitization process and, indeed, might already be in the process of digitizing and indexing some of the materials at issue.  It is also possible that conducting a further sampling from the 400 videos already deemed "more

---

[5] The D.C. Circuit observed, as follows, in *Evans v. Fed. Bureau of Prisons*:

> [I]f we assume that the video record does constitute an unwarranted invasion of privacy as to individuals in the record [such that the material is exempt from release], it is not at all clear from the government's affidavit why it cannot segregate the portions of the record that do not do so.  More specifically, we live in an era in which teenagers regularly send each other screenshots from all sorts of video media.  Presumably, most of these teenagers have fewer resources than the United States government.  It is not at all clear why the government could not at least isolate some screenshots that would meet the same sort of segregability standards typically applied to printed material.

951 F.3d at 587.

likely to be responsive" would assist the Court in determining whether the Department is correct that all of the media at issue would be classified.

Similarly, on the other side of the balance, the Court is persuaded that most of the material at issue, once located, could be withheld under at least Exemptions 1 and 3, and perhaps under Exemptions 6 and 7(E).  But the Court cannot determine on the basis of the existing record whether it might be possible to release at least some portions of the media, with appropriate redactions or blurring (assuming that the Department would be required to and is capable of blurring images as a form of segregating).  The Supplemental Droz Declaration goes a long way toward addressing the Court's concerns, and as noted above, Leopold did not even bother responding to the explanations set forth in that declaration.  *Cf. Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009) ("We accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record because the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse [e]ffects might occur as a result of a particular classified record." (internal quotation marks and citation omitted)).  But at least a handful of questions remain unanswered, thus preventing the Court from concluding with sufficient certainty that an additional search would be pointless.  Those questions might be answered, of course, through a further evidentiary showing or, perhaps, through a further sampling of the videos deemed "more likely to be responsive."

The Court will, accordingly, deny the parties' cross-motions for summary judgment respecting the adequacy of the search without prejudice and will invite the parties to provide further declarations and any supporting material relating to: (1) whether and how the search process might be expedited or narrowed through the use of partial indices or a further sampling

of the videos more likely to be responsive; (2) the number of hours that would be required to complete such a search; (3) whether any portion of any of the videos depicting enteral feedings of Guantanamo Bay detainees would be unclassified, including, for example, videos that blur any means of identifying the Guantanamo personnel and the detainees or that show only a small portion of the process; (4) whether the Department has—or is required to have—the capacity to blur images in that manner; and (5) whether, even if a small portion of the material at issue could be segregated from the classified materials, other FOIA exemptions would necessarily (as opposed to likely) permit the Department to withhold the unclassified portions, if any, of the videos.  Moreover, to the extent some dispute exists over whether any portion of the videos might contain unclassified materials, the Court would consider viewing a few, sample videos *in camera* and *ex parte* to resolve any such dispute.

**B.    Estimated Dates of Completion for FOIA Requests**

Having considered the adequacy of the Department's search in response to Leopold's FOIA requests, the Court now considers Leopold's separate claim that the Department has engaged in a pattern and practice of violating the FOIA by failing to provide estimated dates of completion to FOIA requesters.  Leopold maintains that he has suffered "and will continue to suffer an irreparable informational injury due to SOUTHCOM's refusal to provide estimated dates of completion" and that his ongoing injuries, the absence of an adequate remedy, the balance of hardships, and the public interest all support the issuance of a permanent injunction compelling the SOUTHCOM "to provide requesters with estimated dates of completion upon request."  Dkt. 81-6 at 2; *see also* Dkt. 81 at 33-45.

FOIA mandates that "[e]ach agency shall . . . establish a telephone line or Internet service that provides information about the status of a request to the person making the request . . . ,

including . . . an estimated date on which the agency will complete action on the request."

5 U.S.C. § 552(a)(7)(B)(ii).  Department regulations implement this requirement by providing

that:

> Upon request, the [Department of Defense ("DoD")] Component will provide
> an estimated date by which the DoD Component expects to provide a response
> to the requester.  If a request involves a voluminous amount of material or
> searches in multiple locations, the DoD Component may provide interim
> responses, releasing the records on a rolling basis.

32 C.F.R. § 286.9(c).  Leopold pointedly observes that he "has not made any claim that DOD's

policies are in violation of FOIA."  Dkt. 81 at 33.  The record shows, however, that on several

occasions, SOUTHCOM failed to provide Leopold with an estimated date of completion after he

requested one.  *See, e.g.*, Dkt. 78-2 at 5–6 (Kirby Decl. ¶¶ 11, 14); Dkt. 81-4 at 1–2 (Leopold

Decl. ¶¶ 2–6).  Based on this experience, Leopold contends that the Department has a policy or

practice of failing to comply with its obligation to provide estimated dates of completion "when

it receives requests that involve similar circumstances" to his own requests.  Dkt. 81 at 40.

The Department responds that it has effectively "adhered to 32 C.F.R. § 286.9(c) by

remaining in consistent contact with [Leopold] and providing him interim responses throughout

the administrative process and this litigation."  Dkt. 78-1 at 24–25.  And, it explains that "[w]hile

[the Department] could have provided [Leopold] an interminable completion timetable of five,

ten, or fifteen years, to do so would have been unhelpful to [Leopold]" as "the voluminous,

overlapping, and exceedingly broad FOIA requests at issue . . . made it infeasible . . . to provide

[] an overall estimated date of completion."  *Id.* at 23–24.

Before addressing the merits, the Court must first consider whether it has jurisdiction to

consider the claim.  The inquiry implicates both constitutional and statutory standards.

1.      *Mootness*

The Court starts with Article III standing, which "requires that there be a live case or controversy at the time that a federal court decides the case," *Burke v. Barnes*, 479 U.S. 361, 363 (1987).  To satisfy this requirement, "a plaintiff must demonstrate that he possesses a legally cognizable interest, or 'personal stake,' in the outcome of the action" at the time the complaint is filed, and that he maintains that stake throughout the course of the litigation.  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71–72 (2013) (quoting *Camreta v. Greene*, 563 U.S. 692, 701 (2011)).  "If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot."  *Id.* at 72 (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990)).  Here, the Department contends that Leopold's estimated-completion-date claim is now moot because "[the Department has] complet[ed] its search for potentially responsive materials and [has] release[d] all responsive, non-exempt information."  Dkt. 78-1 at 20.  That argument fails for two reasons.

First, the factual premise of the argument is incorrect.  The Court has yet to conclude that the Department has completed its searches for responsive material.  As explained above, for example, the Court has concluded that the Department has yet to carry its burden of demonstrating that it has conducted an adequate search for artistic renderings of enteral feedings. In short, the question whether the Department has completed the process of searching for and releasing non-exempt responsive records remains in dispute, and that dispute is sufficient to establish an ongoing dispute regarding the Department's statutory obligation to provide Leopold with an estimated date on which it will complete action on at least one of his requests, that is, FOIA Request No. SC 13-142.

41

Second, the legal premise of the Department's mootness argument is also incorrect.  In a pattern or practice case, like this one, a claim for future injunctive relief is not rendered moot simply because the agency has complied with the FOIA request at issue in the litigation.  As the D.C. Circuit has explained, "even though a party may have obtained relief as to a specific request under the FOIA, this will not moot a claim that an agency policy or practice will impair the party's lawful access to information in the future."  *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988); *see also Newport Aeronautical Sales v. Dep't of Air Force*, 684 F.3d 160, 164 (D.C. Cir. 2012) (quoting same).  An agency, moreover, cannot avoid this result "merely by refraining from the conduct [at issue] . . . while the case is pending."  *Payne Enters., Inc.*, 837 F.2d at 491.  Rather, under the voluntary cessation doctrine, "[a] controversy may remain to be settled," as long as the agency "is free to return to [its] old ways."  *Id.* (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).

The Court is, accordingly, satisfied that it has Article III jurisdiction to consider Leopold's request for declaratory and injunctive relief.

2.      *Statutory Jurisdiction*

The Court must consider a second jurisdictional issue, however, which neither party addresses.  The jurisdictional allegations set forth in Leopold's Complaint premise the Court's statutory jurisdiction on a single source: 5 U.S.C. § 552(a)(4)(B).  That section vests the district courts with jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  Notably, Leopold does not bring suit under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, or the Mandamus Act, 28 U.S.C. § 1361, nor does he seek to invoke general federal question jurisdiction, 28 U.S.C. § 1331.  The question the Court must confront, then, is whether this

limited grant of jurisdiction authorizes the federal courts to grant declaratory or injunctive relief enforcing 5 U.S.C. § 552(a)(7)(B)(ii), a provision that does not bear directly on the withholding or release of covered records.

In considering a related question—that is, whether § 552(a)(4)(B) grants the district courts with jurisdiction to require agencies to make certain documents and indexes available for public inspection, as required by § 552(a)(2)—the D.C. Circuit started with the general "proposition that FOIA section 552(a)(4)(B) vests courts with broad equitable authority." *Citizens for Resp. and Ethics in Washington v. U.S. Dep't of Just.*, 846 F.3d 1235, 1241 (D.C. Cir. 2017). But the court went on from there, however, to explain that, "[a]lthough broad, courts' remedial authority under section 552(a)(4)(B) is not boundless." *Id.* at 1242. A court may not, for example, "'order the production' of records no longer in an agency's possession 'even if a document requested under the FOIA is wrongfully' in the hands of a third party." *Id.* (quoting *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 139 (1980)).

Or perhaps closer to this case, the D.C. Circuit held in *Kennecott Utah Copper Corp. v. U.S. Department of Interior*, 88 F.3d 1191, 1202 (D.C. Cir. 1996), that § 552(a)(4)(B) "does not authorize district courts to order publication of" substantive rules of general applicability, pursuant to § 552(a)(1). As the court explained:

> While it might seem strange for Congress to command agencies to "currently publish" or "promptly publish" documents, without in the same statute providing courts with power to order publication, we think that is exactly what Congress intended. Section 552(a)(4)(B) authorizes district courts to order the "production" of agency documents, not "publication." The question, then, is whether Congress intended "production" to include "publication." The dictionary does not resolve the matter. "Production" could mean either providing the document to an individual or broadcasting it to the broader public. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1810 (1993). Nor is this a situation where only one interpretation comports with the statute's purpose. The statute imposes "a general obligation on the agency to make information available to the public," *see Chrysler Corp. v. Brown*, 441

> U.S. 281, 292 (1979), an obligation that could be fulfilled either by handing the
> document over to an individual or by publishing it in the Federal Register.  We
> think it significant, however, that § 552(a)(4)(B) is aimed at relieving the injury
> suffered by the individual complainant, not by the general public.  It allows
> district courts to order "the production of any agency records improperly
> withheld from the complainant," not agency records withheld from the public.
> 5 U.S.C. § 552(a)(4)(B) (emphasis added).  Providing documents to the
> individual fully relieves whatever informational injury may have been suffered
> by that particular complainant; ordering publication goes well beyond that need.

*Id.* at 1202–03.  Here, Leopold seeks an injunction that would apply to all requesters, and not just

himself.  Dkt. 81-6 at 2.  But the more important take away from *Kennecott Utah Copper Corp.*

is that, although courts have broad authority to grant relief to remedy the improper withholding

of records from the complainant, that authority is not wholly unmoored from the text of

§ 552(a)(4)(B).

This Court further explained this principle in *Natural Resources Defense Council, Inc. v.*

*EPA*, 383 F. Supp. 3d 1 (D.D.C. 2019).  There, the Court wrote:

> As an initial matter, the D.C. Circuit cases considering FOIA policy or practice
> claims have all involved an agency practice that impaired or frustrated the
> plaintiff's prompt access to nonexempt agency records.  The injury that each
> injunction or order sought to remedy was an agency's failure to release
> nonexempt records in a timely manner.  Although not authorized in express
> terms by 5 U.S.C. § 552(a)(4)(B), each injunction or order served the same
> ultimate goal as that statutory provision: the timely production of nonexempt
> records as "a means for citizens to know 'what their Government is up to.'"
> *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004)
> (citation omitted).  Most recently, in *Judicial Watch*, the D.C. Circuit recognized
> this focus, explaining that to bring a policy or practice claim under *Payne*, a
> plaintiff "must allege a [policy or practice] amounting to a persistent failure to
> adhere to FOIA's requirements and that [this practice] will interfere with its right
> under FOIA to promptly obtain non-exempt records from the agency in the
> future."  *Judicial Watch, Inc*., 895 F.3d at 780 (emphasis added).

*Id.* at 13.

The legislative history of § 552(a)(4)(B) casts further doubt on whether § 552(a)(4)(B)

was intended to vest district courts with jurisdiction to enforce § 552(a)(7)(B)(ii).  In particular, a

Senate Report from 1974 explains that Congress intended "the judicial review provisions [to] apply to requests for information under subsections (a)(1) and (a)(2) of section 552 as well as under subsection (a)(3)."  S. Rep. No. 854, 93d Cong., 2d Sess. at 9 (1974).  Section 552(a)(7)(B)(ii), in turn, was not enacted until years later, *see* Pub. L. No. 110-175, Sec. 7, 121 Stat. 2527 (2007), and it is far from clear that Congress intended § 552(a)(4)(B), which grants the district courts with jurisdiction to redress the improper "withholding [of] agency records," to apply to a later-adopted provision, which does not require the release of agency of records but, rather, merely requires agencies to keep requesters apprised of the "estimated date on which the agency will complete action on the request," 5 U.S.C. § 552(a)(7)(B)(ii).

Because neither party has addressed whether this Court has statutory jurisdiction to issue an injunction compelling SOUTHCOM to comply with § 552(a)(7)(B)(ii) in processing future FOIA requests received from Leopold or others, the Court will refrain from reaching any firm conclusions at this time.  The Court further notes that there is reason to doubt that the application of § 552(a)(7)(B)(ii) to the one remaining FOIA request at issue in this case, Request No. 13-142, presents a live controversy, since the Department's view prior to the issuance of this opinion was that its processing of the request was "completed" long ago, and because the Court is likely to set the timetable for any future processing efforts.  The Court will, accordingly, deny both cross-motions for summary judgment with respect to Leopold's estimated-completion-date claim.  The Court cannot reach the merits of that claim without first concluding that it has jurisdiction, and that question cannot be answered without the benefit of further briefing.

Finally, it bears note that the Court does not intend to suggest a view on the merits of this claim—one way or the other—and thus the parties should not assume that statutory jurisdiction

is the only remaining hurdle that they face.  *See Nat. Res. Def. Council, Inc*., 383 F. Supp. 3d at

14–15 (discussing the showing required to obtain injunctive relief in a pattern or practice case).

## CONCLUSION

For the foregoing reasons, the Department's motion for summary judgment, Dkt. 78, is

**DENIED**, and Leopold's cross-motion for summary judgment, Dkt. 81, is **DENIED**.

In addition, the parties are hereby **ORDERED** to file a joint status report on or before

October 18, 2024, with a proposal for how best to bring this long-running dispute to an

expeditious conclusion.

In that spirit the parties are further **ORDERED** to meet and confer to determine whether

the remaining issues can be narrowed or streamlined in a manner that serves both the purposes of

FOIA and the command of Rule 1 of the Federal Rules of Civil Procedure that the rules should

be employed "to secure the just, speedy, and inexpensive determination of every action and

proceeding."  Fed. R. Civ. P. 1.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 27, 2024